UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
────────────────────────────────

CHRISTOPHER L. WELCH,

        Plaintiff,

  -vs-

BILL CRAM, INC., STEPHEN RUSH, and
AMY CRAM,

        Defendants.

────────────────────────────────

**DECISION and ORDER**
**No. 6:15-cv-06391(MAT)**


## INTRODUCTION

Christopher L. Welch ("Welch" or "Plaintiff"), represented by counsel, instituted this action against Bill Cram, Inc. ("the Company"), Amy Cram ("Cram"), Stephen Rush[1] ("Rush") (collectively, "Defendants"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), alleging claims of discrimination based on sex and gender; retaliation; hostile work environment; and quid pro quo sexual harassment. Plaintiff also asserts parallel discrimination and retaliation claims under New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("NYSHRL"), as well as State law claims of assault and battery. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

─────────────

[1]

Defendants have indicated that the correct name of defendant Stephen Rush is Leslie Stephen Rush. The Clerk of Court is directed to amend the caption accordingly.

**FACTUAL BACKGROUND**

The Company has operated as a new and used automobile dealership in Seneca Falls, New York, for nearly 50 years. Cram assumed ownership of the Company in 2012, and is responsible for interviewing and hiring new employees. Plaintiff was hired by Cram to work at the Company as a Parts Clerk commencing on June 9, 2014. Plaintiff was provided with, and signed, a copy of the Company's Harassment Policy at the time he was hired.

While employed at the Company, Plaintiff's duties included ordering, organizing, sorting, storing, retrieving, and stocking of automotive parts for use on new and used vehicles; and performing some local deliveries of automotive parts. Rush, the Parts Manager at the Company, was Plaintiff's supervisor on a day-to-day basis. There were a total of three employees working in the Parts Department during the time Plaintiff was employed at the Company—Rush, Plaintiff, and non-party Chris Ritter ("Ritter"), Cram's son.

For approximately the first week and a half of his employment, Plaintiff had no issues with Rush. One day, Rush became upset when he could not find a part that he believed Plaintiff had misplaced. Rush threw an oxygen sensor at Plaintiff, hitting him in the leg. Plaintiff said, "That's not right. . . You shouldn't do that." (Deposition of Christopher L. Welch ("Welch Dep.") (Dkt #19-3) at

100:7-9). Rush replied, "If you complain, I'll see that you get fired.") (Id. at 100:12-13).

Soon after this incident, Rush began groping Plaintiff's buttocks multiple times every day, such as while walking up stairs. (Welch Dep. at 102:2-6, 19-23; 103-104). Rush also would touch Plaintiff's shoulders "like [he] was giving [Plaintiff] a back massage[.]" (Id. at 130). Rush would come up behind Plaintiff and rub his genitals against Plaintiff's buttocks and back. (Id. at 109:19-23, 110-111:1-10, 131:22-23—132:1-4). Plaintiff asked Rush to stop engaging in these behaviors because they made him uncomfortable; Rush replied that if Plaintiff complained, Rush would see to it that he was fired. (Id. at 111:11-23, 131:1-12). In addition to physically touching Plaintiff in ways that made Plaintiff uncomfortable, Rush made comments of a sexual nature to Plaintiff about female co-workers, customers, and vendors. (Id. at 108). For instance, Rush commented, "Wow, look at those boobs," in regards to a co-worker who was pregnant (Id. at 117:1-9, 15-23; 118:1-13); mentioned that a female co-worker had a "nice ass"; said, in regards to a female customer, "I'd like to get a blowjob from her, . . . she has nice lips"; and commented that Cram "has a nice body for her age." (Id. at 114:19-23—115:1-6, 120, 126). Rush constantly referred to male employees at the Company as "assholes" and "faggots" and was generally rude to them. (Id. at 104:9-23,

105-106). Rush "would always say if [Plaintiff] complained, [he]'d get fired." (Id. at 131:1-12).

On or about July 2, 2014, Plaintiff went to Cram and complained about Rush's behavior and comments, as well as Rush's threats to terminate him if he complained. Plaintiff requested to be moved to another department so that he would not have to interact further with Rush. (Welch Dep. at 141-42). Cram told Plaintiff she would look into it and get back to him. (Id. at 147:1-12).

The next day, July 3, 2014, Plaintiff observed Cram and Rush having a conversation in hushed voices. About five minutes later, Rush walked over to Plaintiff and said that Cram wanted to see him in her office. (Welch Dep. at 152). With Rush present, Cram informed Plaintiff that it was "not working out for [him]" and that she was "going to have to let [him] go." (Id. at 149-50). Plaintiff was asked to sign a termination slip and left the Company immediately afterwards.

## PROCEDURAL HISTORY

Plaintiff filed his Complaint on June 29, 2015. The parties exchanged discovery and participated in mediation, which was unsuccessful. Defendants filed their Motion for Summary Judgment (Dkt #16) on April 28, 2017. After obtaining a 30-day extension, Plaintiff filed his opposition papers (Dkt #19) on June 28, 2017. Defendants did not file a reply. The motion was submitted without

oral argument on July 12, 2017. For the reasons discussed herein, Defendants' Motion for Summary Judgment is denied in part and granted in part.

## LEGAL STANDARDS

A court "shall grant summary judgment" if the movant shows that "there is no genuine dispute as to any material fact" and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "On a motion for summary judgment, the court '"cannot try issues of fact; it can only determine whether there are issues to be tried."'" Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989) (quoting Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir. 1987); further quotation and citations omitted). Thus, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)).

**DISCUSSION**

I.    **Title VII Claims**

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Second Circuit "repeatedly noted that 'summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.'" Ramseur, 865 F.2d at 465 (quotation and citations omitted). Employment discrimination cases necessarily turn on the alleged discriminatory intent of the employer, and employees rarely are able to produce direct evidence of their employers' discriminatory intent. See id. at 464-65 ("In assessing the inferences to be drawn from the circumstances of the termination, the court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that the firing is for a reason expressly forbidden by law.") (quotation and citations omitted; brackets in original). Thus, the absence of direct or explicit evidence that a challenged personnel action was motivated by an impermissible reason is not fatal to a claim of discrimination under Title VII. Id. at 465. Rather, if a plaintiff shows that the employer's "proffered justification is pretextual[,]" id., this is "itself sufficient to support an

inference that the employer intentionally discriminated."
Id. (citations omitted).

## A. Claims Against the Individual Defendants

It is well settled in the Second Circuit that "Title VII does not impose liability on individuals[.]" Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012) (citations omitted). This is true even if those individuals exercised "supervisory control" over the plaintiff. Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) ("Ellerth"). Here, Plaintiff indicates in his Complaint that his Title VII causes of action are asserted only against the Company and not against individual defendants Cram and Rush.

## B. Title VII Harassment Claims Against the Company

As the Second Circuit has explained, "[c]ourts have traditionally recognized two forms of sexual harassment: 'quid pro quo' harassment and 'hostile work environment' harassment[,]" Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004) (citation omitted), although these terms do not appear in the text of Title VII, id. "Quid pro quo" describes "cases involving a threat which is carried out[,]" Ellerth, 524 U.S. at 753, while "hostile work environment" refers to "offensive conduct in general." Id.

## 1. Quid Pro Quo Sexual Harassment

To make out a prima facie case of sexual harassment under a quid pro quo theory against an employer, an employee must show "that an 'explicit . . . alteration[ ] in the terms or conditions of employment' resulted from [his] refusal to submit to [a supervisor]'s sexual advances." Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 603 (2d Cir. 2006) (quotation omitted; ellipsis and first brackets in original). Generally speaking, a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Schiano, 445 F.3d at 604 (quotations omitted). "Under the Guidelines established by the Equal Employment Opportunity Commission . . . , quid pro quo harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'" Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994) (quoting 29 C.F.R. § 1604.11(a)(2) (1993); brackets in original). "[L]iability for quid pro quo harassment is always imputed to the employer[.]" Id. at 779 (citing Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 62 (2d Cir. 1992)).

The Court finds that Plaintiff has stated a prima face case of quid pro quo sexual harassment. Plaintiff testified at his

deposition to a number of instances of unwelcome physical contact of a sexual nature by his direct supervisor, Rush. Plaintiff also testified that his supervisor, Rush, explicitly made comments to Plaintiff conditioning his continued employment on Plaintiff's submission to the unwelcome sexual advances. In particular, Plaintiff testified that Rush groped his buttocks multiple times every day, rubbed his genitals against Plaintiff's buttocks and back, and rubbed his shoulders in a sexual way on several occasions. When Plaintiff told Rush to stop engaging in these types of behaviors, Rush replied that if Plaintiff complained about them, Rush would have him fired. "[O]nce an employer conditions any terms of employment upon the employee's submitting to unwelcome sexual advances, a quid pro quo claim is made out, regardless of whether the employee (a) rejects the advances and suffers the consequences, or (b) submits to the advances in order to avoid those consequences." Karibian, 14 F.3d at 777; see also id. at 778 ("Karibian stated that her work assignments, raises and promotions depended on her continued responsiveness to Urban's sexual demands. In addition, Karibian claimed that Urban implicitly threatened to fire her and to damage her career if she did not comply. If true, Urban's conduct would constitute quid pro quo harassment because he made and threatened to make decisions affecting the terms and conditions of Karibian's employment based upon her submission to his sexual advances.").

### 2. Hostile Work Environment

"A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986) ("Vinson"). "In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment."'" Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Vinson, 477 U.S. at 65, 67)), superseded by statute on other grounds as stated by Jones v. N.Y. State Metro D.D.S.O., 543 F. App'x 20 (2d Cir. 2013). In order to make this showing, the plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted).

"[A] plaintiff seeking to establish harassment under a hostile environment theory must demonstrate some specific basis to hold the employer liable for the misconduct of its employees." Karibian, 14 F.3d at 779 (citing Kotcher, 957 F.2d at 62). Thus, "[e]ven if a work environment is found to be abusive, . . . a plaintiff 'must

establish that the conduct which created the hostile work environment should be imputed to the employer.'" <u>Tomka</u>, 66 F.3d at 1305 (quoting <u>Kotcher</u>, 957 F.2d at 63). The Second Circuit has held that when a plaintiff's supervisor is the alleged harasser, "an employer will be liable if the supervisor uses his actual or apparent authority to further the harassment, or if [the supervisor] was otherwise aided in accomplishing the harassment by the existence of the agency relationship." <u>Karibian</u>, 14 F.3d at 780 (citing <u>Restatement (Second) of Agency</u> § 219(2)(d) (1958); 29 C.F.R. § 1604.11(c); <u>Hirschfeld v. New Mexico Corr. Dep't</u>, 916 F.2d 572, 579 (10th Cir. 1990); other citations omitted).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances[,]" "includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; . . . whether it unreasonably interferes with an employee's work performance. . . [and] [t]he effect on the employee's psychological well-being. . ." <u>Harris</u>, 510 U.S. at 23. Given the extremely short period of time in question and the quantity of comments, touching, and other conduct alleged, the Court finds that Plaintiff has created a genuine issue of material fact as to whether he faced a hostile work environment. <u>See</u> <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 102-03 (2d Cir. 2010) ("Assuming arguendo that no single one of the

comments or instances of physical conduct was sufficiently egregious on its own, when taken together they do describe a work environment in which a jury could find that men, including Gorzynski's supervisor, were able to—and did at will—comment inappropriately on women as sexual objects. The evidence does not reveal a 'mere offensive utterance,' but a pattern in which female employees such as Gorzynski could expect sexual remarks and other harassment at any time.") (citing <u>Hicks v. Gates Rubber Co.</u>, 833 F.2d 1406, 1415-16 (10th Cir. 1987) (explaining that incidents of sexual harassment directed at employees other than the plaintiff can be used as proof of a hostile work environment claim because one of the critical inquiries is the "general work atmosphere" as well as specific hostility to the plaintiff)). In addition, Plaintiff has shown a basis for imputing Rush's objectionable conduct to the Company, because Rush was Plaintiff's direct supervisor. <u>See</u> <u>Gorzynski</u>, 596 F.3d at 103 ("When, as here, the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer.") (citations omitted). Therefore, the Court finds that Plaintiff's hostile work environment claim may proceed.

### 3. Discrimination Based on Gender

Plaintiff asserts that he has made a prima facie case of sex and gender discrimination claim under Title VII based on his allegations that Rush treated male employees differently from

female employees; for instance, Rush continually made derogatory comments about male employees such as "he's a faggot" and "he's an asshole." According to Plaintiff, when there were female employees present, Rush would treat them "all nice and sweet," but if there were male employees, "[Rush] would just be rude to them or just talk bad about them" to Plaintiff. (See Welch Dep. at 104-06).

As discussed in the preceding section, because Plaintiff has stated a hostile work environment claim under Title VII, he has already plausibly pleaded "a form of gender-based discrimination." Parra v. City of White Plains, 48 F. Supp.3d 542, 553 (S.D.N.Y. 2014) (quoting Bermudez v. City of N.Y., 783 F. Supp.2d 560, 585 (S.D.N.Y. 2011)); see also Meritor, 477 U.S. at 64 ("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminate[s] on the basis of sex."). To state a "separate gender discrimination" claim, however, Plaintiff must plead "'a separate and distinct prima facie case,' alleging an adverse action beyond the creation of a hostile work environment." Id. (quoting Bethea v. City of N.Y., No. 11 CV 2347(SJ)(JMA), 2014 WL 2616897, at *6 (E.D.N.Y. June 12, 2014)). "Whereas hostile work environment claims consider the 'workplace environment as a whole,' disparate treatment claims require a tangible, 'discrete harm[ ] such as hiring or discharge.'" Id. (quoting Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001); brackets in original).

Plaintiff alleges only one plausible adverse action beyond the creation of a hostile work environment: his termination. However, Plaintiff does not allege he was terminated because of his gender. Moreover, his Complaint does not set forth a separate cause of action alleging that he was fired due to his gender. Rather, the First Cause of Action is described as one for "Discrimination Under Title VII" and alleges that the Company "engaged in unlawful employment practice . . . by retaliating against Plaintiff . . . because of his opposition to the unlawful employment practices of [the Company]." (Compl., ¶ 55). Thus, while his termination provides support for his retaliation claim, it does not plausibly suggest disparate treatment. Parra, 48 F. Supp.3d at 553–54 (citing Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) ("The sine qua non of a gender-based discriminatory action claim under title VII is that the discrimination must be because of sex.") (internal quotation marks omitted)).

Accordingly, the Court finds that Plaintiff has failed to make out a prima facie case of gender discrimination claim under Title VII. E.g., Parra, 48 F. Supp.3d at 554 (citing Bethea, 2014 WL 2616897, at *6 (plaintiff plausibly stated hostile work environment claim but could not state "separate and additional claim of gender discrimination" based on same facts); Bermudez, 783 F. Supp.2d at 585 (same)).

**B.    Retaliation Claims Against the Company**

"To make out a prima facie case of retaliation [under Title VII], a plaintiff must make four showings: that '(1) [he] engaged in a protected activity; (2) [his] employer was aware of this activity; (3) the employer took adverse employment action against [him]; and (4) a causal connection exists between the alleged adverse action and the protected activity.'" Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013) (quoting Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006)). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." Raniola, 243 F.3d at 625. "If the employer demonstrates a legitimate, non-discriminatory reason, then '[t]he burden shifts . . . back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.'" Summa, 708 F.3d at 125 (quoting Raniola, 243 F.3d at 625; brackets and ellipsis in original).

With regard to the first two factors–engaging in protected activity of which the employer was aware, a plaintiff "need not establish that the conduct [he] opposed was actually a violation of Title VII, but only that [he] possessed a good faith, reasonable belief that the underlying employment practice was unlawful under

that statute." <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136
F.3d 276, 292 (2d Cir. 1998) (internal quotation marks omitted);
<u>accord</u> <u>Summa</u>, 708 F.3d at 126. The "notion of 'opposition' [to a
Title VII violation] includes activities such as 'making complaints
to management, writing critical letters to customers, protesting
against discrimination by industry or by society in general, and
expressing support of co-workers who have filed formal charges.'"
<u>Cruz</u>, 202 F.3d at 566 (quoting <u>Sumner v. United States Postal
Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990)).

    The Court finds that Plaintiff has made out a prima facie case
of retaliation. As to the first element, Plaintiff engaged in
protected activity since he had a good faith reasonable belief that
Rush's behavior was unlawful under Title VII, and he complained to
management about it. As to the second element, the Company
certainly was aware that Plaintiff was engaging in protected
activity since Plaintiff informed Cram, the sole officer of the
Company, about his direct supervisor's allegedly unlawful conduct.
With regard to the third element, Plaintiff undoubtedly suffered an
adverse action by being terminated. As to the fourth element,
causation, the Second Circuit "[has] regularly held that '[t]he
causal connection needed for proof of a retaliation claim can be
established indirectly by showing that the protected activity was
closely followed in time by the adverse action.'" <u>Summa</u>, 708 F.3d
at 127-28 (holding that the "close temporal relationship [of four

months] is made even closer by the fact that the adverse action occurred at the first actual opportunity to retaliate") (quoting Cifra v. General Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted; second brackets in original). Here, Plaintiff's termination occurred the day after he complained to Cram about Rush's objectionable behavior. The Court finds that the presentation of this "temporal connection is enough, in and of itself, . . . to permit a reasonable jury to find causation." Id.

"Once a prima facie case is made, the burden of production 'shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its actions.'" Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991) (quoting Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir. 1988) (further citation omitted in original)). The Company asserts that the decision to discharge the Plaintiff was based solely on his inability to perform the work he was hired to do. According to Rush, during Plaintiff's tenure at the Company, numerous automotive parts for which Plaintiff was responsible were missing from the correct corresponding bins on an almost daily basis. (See Defendants' Rule 56(a)(1) Statement ("Defs' Stmt"), ¶ 12 (citing Defendants' Exhibit ("Defs' Ex.") B (Dkt #16-4), Deposition of Leslie Rush ("Rush Dep.") at 22:16-23; Defs' Ex. F (Dkt #16-8), Copies of Invoices). "Because poor job performance constitutes a legitimate, non-discriminatory reason," E.E.O.C. v. Town of Huntington, No. 05 CV 4559 DRH WDW, 2008 WL

361136, at *7 (E.D.N.Y. Feb. 8, 2008), the Court finds that the Company has satisfied its burden of production. Id. (citing Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action."); Bellom v. Neiman Marcus Grp., Inc., 975 F. Supp. 527, 532 (S.D.N.Y. 1997) (failure to meet sales quota was a sufficient nondiscriminatory reason)).

Once an employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff then has the burden of showing that the stated reason was pretextual, and that, more likely than not, discrimination motivated the adverse employment action. Raniola, 243 F.3d at 625. "To avoid summary judgment in an employment discrimination case, 'the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the "motivating" factors.'" Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008) (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995); citation omitted); see also Weber v. City of N.Y., 973 F. Supp.2d 227, 255-56 (E.D.N.Y. 2013) ("To avoid summary judgment, Plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the

evidence that [prohibited] discrimination played a role in the adverse actions taken against Plaintiff.").

Construing the evidence in the light most favorable to Plaintiff, the Court finds that there is a sufficient basis for a reasonable trier of fact to doubt the Company's proffered evidence and ultimately find that the reason offered by the Company was pretextual. As noted above, Plaintiff testified that every time he asked Rush to stop making offensive comments or touching him, Rush replied that if Plaintiff complained, Rush would have him fired. Plaintiff testified that he saw Rush and Cram having a whispered conversation approximately five minutes before he was called into Cram's office and fired. Significantly, Cram admitted at her deposition that while the Company had a progressive discipline policy, Plaintiff never received a verbal or written warning prior to his termination. (See Deposition of Amy Cram, Part 2 ("Cram Dep. 2") (Dkt #22) at 20). Thus, Cram did not apply the progressive discipline policy to Plaintiff, which in itself is evidence of disparate treatment. Cram testified that she did not recall what she said to Plaintiff when she fired him. Nonetheless, Cram admitted that she terminated Plaintiff solely on the basis of Rush's statements, on the day of Plaintiff's firing, concerning Plaintiff's alleged performance issues. (See Deposition of Amy Cram, Part 1 ("Cram Dep. 1") (Dkt #16-3) at 21:4-8). According to Rush, Plaintiff put parts away in the wrong locations on a daily

basis which caused delays and duplicative work for other employees at the Company. (See Deposition of Leslie Stephen Rush ("Rush Dep.") (Dkt #16-4) at 18, 21-22). Plaintiff counters that Cram testified in her deposition that Plaintiff's primary job responsibility was delivering auto parts to other stores and vendors in the area, not the stocking of auto parts. (See Cram Dep. 1 at 14). In any event, Rush admitted that he never issued Plaintiff a warning about his allegedly poor performance, and never had a meeting with Cram about any performance issues with Plaintiff. (Rush Dep. at 17). Cram also testified that she never spoke to Plaintiff at any time other than his interview and his firing. (Cram Dep. 1 at 19). Plaintiff testified that the Company's General Manager, Pat Pike ("Pike"), told him that he was doing a great job, and that she wanted Plaintiff to take over Rush's position. (Welch Dep. at 80). Rush, on the other hand, testified that he informed Pike about Plaintiff's performance issues. (Rush Dep. at 23:17-23).

Drawing all reasonable inferences in Plaintiff's favor and foregoing any credibility assessments, as it must, the Court finds that Plaintiff's evidence is "sufficient for a reasonable juror to find a retaliatory motive in [his] termination." Stathatos v. Gala Res., LLC, No. 06 CIV. 13138 RLC, 2010 WL 2024967, at *11 (S.D.N.Y. May 21, 2010) (citing James v. New York Racing Ass'n, 233 F.3d 149,

154 (2d Cir. 2000); other citation omitted). Plaintiff's Title VII retaliation claim may go forward.

## C. The Faragher/Ellerth[2] Affirmative Defense

The Company asserts entitlement to the Faragher/Ellerth affirmative defense as against Plaintiff's hostile work environment and harassment claims under Title VII. This defense consists of the following two elements: that (1) "the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. "The employer may raise the defense, however, only if one of two further elements is met: either (1) the employee's supervisor took no 'tangible employment action,' which involves an official company act, against the employee; or (2) any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment." Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006) (quoting Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765).

Here, however, the Company did take a tangible employment action against Plaintiff—it terminated him. See Ellerth, 524 U.S.

---

2

See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Ellerth, 524 U.S. at 765.

at 761 ("A tangible employment action constitutes a significant change in employment status, such as . . . firing. . . ."). Furthermore, as discussed above, Plaintiff has raised genuine issues of material fact as to whether his termination was part of his supervisor's discriminatory harassment. Stated another way, Plaintiff has presented evidence connecting Rush's harassment to Cram's termination decision.

Moreover, contrary to Defendants' suggestion, "the existence of a sexual harassment policy and training alone does not satisfy the employer's burden under the first prong of the Ellerth/Faragher defense because the employer not only must take reasonable care to prevent sexually harassing behavior but also to correct promptly any such behavior." Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1062 (10th Cir. 2009) (citing Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807; Hurley v. Atl. City Police Dep't, 174 F.3d 95, 118 (3d Cir. 1999)). Here, the Company did not "take reasonable care . . . to correct promptly" the harassing behavior by Rush about which Plaintiff complained. Instead, the Company terminated Plaintiff the day after he voiced his concerns.

For all of these reasons, the Court finds that the Company cannot avail itself of the Faragher/Ellerth defense.

**II. State Law Claims**

    **A. NYSHRL**

        **1. Hostile Work Environment and Retaliatory Discharge**

Discrimination claims under the NYSHRL are evaluated using the same analytical framework used in Title VII actions. E.g., Patane, 508 F.3d at 113 (citation omitted); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) ("New York courts require the same standard of proof for claims brought under the [NYSHRL] as those brought under Title VII.") (quotation omitted). In contrast to Title VII, liability under the NYSHRL for employment discrimination may be imposed on individuals. E.g., Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003).

Because Plaintiff's Title VII hostile work environment, quid pro quo sexual harassment, and retaliation claims survive summary judgment, Plaintiff's parallel claims under the NYSHRL also withstand summary judgment and may proceed against the Company and the individual defendants, Cram and Rush.

        **2. Aiding and Abetting**

Plaintiff also asserts an "aiding and abetting" claim under the NYSHRL against the individual defendants, Cram and Rush. Section 296(6) of New York Executive Law ("§ 296(6)") provides in relevant part that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the

doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. L. § 296(6).

According to the Second Circuit, liability under § 296(6) is distinguishable from direct liability under N.Y. Exec. L. § 296(1), in that a defendant need not be the employer, or hold authority to hire or fire the plaintiff, in order to be found liable for aiding and abetting the discriminatory practice. Tomka, 66 F.3d at 1317. Thus, a defendant "who actually participates in the conduct giving rise to a discrimination claim" may be personally liable under § 296(6). Id.

Defendants argue that Plaintiff's § 296(6) claim fails as a matter of law because, according to the Complaint's allegations, Rush was the sole perpetrator of the workplace harassment, and Cram was the sole perpetrator of the retaliatory discharge. Defendants argue that "[a]n individual cannot aid and abet his own alleged discriminatory conduct." Raneri v. McCarey, 712 F. Supp.2d 271, 282 (S.D.N.Y. 2010) (citation omitted). However, "the law in this Circuit seems clear that a defendant may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability." Conklin v. Cty. of Suffolk, 859 F. Supp.2d 415, 436 (E.D.N.Y. 2012); see also Johnson v. Cty. of Nassau, 82 F. Supp.3d 533, 536 (E.D.N.Y. 2015) ("Regardless of whether other employees contributed to the discrimination, under Tomka, a

plaintiff may succeed in a claim under the NYSHRL by showing the employer entity's having encouraged, condoned, or approved the discriminatory conduct of a sole employee—the same discriminatory conduct which then, perhaps 'circular[ly]', proves individual liability under the aiding and abetting provision of Section 296(6).") (quoting <u>Lewis v. Triborough Bridge & Tunnel Auth.</u>, No. 97 CIV. 0607 PKL, 2001 WL 46986, at *2 (S.D.N.Y. Jan. 18, 2001), <u>aff'd</u>, 31 F. App'x 746 (2d Cir. 2002); other citations omitted). While some courts have sidestepped <u>Tomka</u>'s binding authority and "dismissed § 296(6) cases where there is only one defendant perpetrating discriminatory conduct on the theory that a party cannot aid and abet his own actions[,]" <u>Lewis</u>, 2001 WL 46986, at *2 (citations omitted), here there are two defendants who each allegedly engaged in discriminatory misconduct. A reasonable factfinder could conclude that Rush aided and abetted Cram in carrying out the retaliatory termination of Plaintiff's employment. And, a reasonable factfinder could conclude that Cram and the Company condoned Rush's discriminatory harassment by terminating Plaintiff after he complained about it. Therefore, the Court will allow Plaintiff's § 296(6) claims to proceed as to Cram and Rush.

## B. Intentional Torts

Plaintiff alleges supplemental state law tort claims of assault and battery as against Rush.

### 1.    Statute of Limitations

The applicable statute of limitations period for intentional torts such as assault and battery is one year. <u>See</u> N.Y. Civ. Prac. L. & R. § 215(3); <u>Friedman v. Gallinelli</u>, 659 N.Y.S.2d 317, 318 (2d Dept. 1997). Plaintiff filed his Complaint on June 29, 2015. Accordingly, with regard to Plaintiff's causes of action based on assault and battery, any and all incidents occurring prior to June 29, 2014, are time-barred by the statute of limitations and cannot support a recovery. Since Plaintiff was terminated on July 3, 2014, the only incidents that can support a recovery must have occurred during the five-day period from June 29th to July 3rd.

### 2.    Battery

"New York law does not make intent to cause physical injury an element of the torts of assault and battery." <u>Rivera v. Puerto Rican Home Attendants Servs., Inc.</u>, 930 F. Supp. 124, 133 (S.D.N.Y. 1996) (citing <u>Zgraggen v. Wilsey</u>, 606 N.Y.S.2d 444, 445 (3d Dept. 1994); other citations omitted). ""To prove battery, the required intent is merely that the defendant intentionally made bodily contact and that the intended contact was itself offensive or without consent." <u>Id.</u> (citations omitted).

The Complaint here states a claim for battery as defined under New York State law. Specifically, Plaintiff alleges that Rush spanked him on the buttocks on July 1, 2014. (Compl., ¶ 37). Plaintiff clearly has alleged that Rush "deliberately touched [him]

and that the intended physical contact was offensive and unwelcome.

. . .” Id. (citing O'Reilly v. Executone of Albany, Inc., 503

N.Y.S.2d 185, 186 (3d Dept. 1986) (former employee's complaint

alleging sexual harassment, including touching in a sexual manner,

was sufficient to state cause of action for battery)).

### 3. Assault

"Under New York law, '[a]n "assault" is an intentional placing

of another person in fear of imminent harmful or offensive

contact.'" Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir.

2001) (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty

Corp., 994 F.2d 105, 108 (2d Cir. 1993)). "[T]he intent requisite

to an assault under New York law is the intent either to inflict

personal injury or to arouse apprehension of harmful or offensive

bodily contact." Rivera, 930 F. Supp. at 133 (citations omitted;

emphasis in original). Plaintiff has adequately alleged that Rush,

on multiple occasions, intentionally placed him in fear of

offensive contact, and did actually make offensive contact with

Plaintiff's person. See Masters v. Becker, 254 N.Y.S.2d 633, 635

(2d Dep't 1964) ("A plaintiff in an action to recover damages for

an assault founded on bodily contact must prove only that there was

bodily contact; that such contact was offensive; and that the

defendant intended to make the contact."); see also Wahlstrom v.

Metro-N. Commuter R. Co., 89 F. Supp.2d 506, 528–29 (S.D.N.Y. 2000)

("[P]laintiff alleges that Chapman grabbed her from behind, put her

in a bear hug, grabbed and squeezed her buttock, and slapped it three times. . . . It is this alleged intentional physical contact—not [Chapman]'s crass comments—that precludes summary judgment on plaintiff's assault claim.") (internal and other citation omitted).

## CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment (Dkt #16) is denied in part and granted in part. Specifically, Plaintiff's claim for gender discrimination under Title VII and the NYSHRL is dismissed. The remainder of Plaintiff's Title VII and State law claims may proceed.

The Clerk of Court is directed to amend the caption so that defendant Stephen Rush is properly named as "Leslie Stephen Rush."

**SO ORDERED.**

S/Michael A. Telesca
HON. MICHAEL A. TELESCA
United States District Judge

DATED:    August 25, 2017
          Rochester, New York